# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **NETSTANDARD INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **Case No. 16-2343-CM** |
| **CITRIX SYSTEMS, INC.,** ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM AND ORDER

Plaintiff Netstandard, Inc. brought this action for breach of contract and various torts against defendant Citrix Systems, Inc., claiming that software that plaintiff purchased from defendant did not perform as advertised, causing damages exceeding $4 million. Defendant filed Defendant Citrix Systems, Inc.'s Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (Doc. 30). The parties agreed to conduct discovery relevant to the motion before completing briefing. The motion is now ripe, and defendant has also filed a related motion—Citrix Systems, Inc.'s Motion to Strike Declaration of Walt Lane (Doc. 76). For the following reasons, the court denies both motions.

Defendant wants this case heard in the Southern District of Florida. Defendant bases its transfer request on a forum selection clause contained in two End User License Agreements ("EULAs"). Defendant argues alternatively that (1) plaintiff's contract was subject to defendant's EULAs or (2) plaintiff had notice that the software was subject to the EULAs.

The federal statute governing transfer of venue provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The intent of § 1404(a) is to "place discretion in the district court to adjudicate motions for transfer according to an individualized, case-

-1-

by-case consideration of convenience and fairness." *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991) (citations omitted). "The party moving to transfer a case pursuant to § 1404(a) bears the burden of establishing that the existing forum is inconvenient." *Id*. at 1515 (citation omitted).

The analysis, however, changes when a forum selection clause is involved. A forum selection clause will be enforced, absent a strong showing that transfer would be "unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 15, (1972) (citation omitted); *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 581 (2013) ("When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause."). In fact, the Supreme Court has gone so far as to state, "Only under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied." *Id.* Of course, this presupposes that the parties in fact agreed to provisions including a forum selection clause—something that plaintiff denies here. Plaintiff claims that the EULAs were not part of the contract to purchase software; instead, they were a request to amend the contract, which plaintiff never accepted. And plaintiff further claims that it had no notice that the EULAs would apply to this contract. The court addresses each of these arguments below.

### **When was the contract formed?**

The first question concerns when the contract was formed. The Uniform Commercial Code ("UCC") applies to the sale of the software. *See Wachter Mgmt. Co. v. Dexter & Chaney, Inc.*, 144 P.3d 747, 750 (Kan. 2006) ("Computer software is considered to be goods subject to the UCC even though incidental services are provided along with the sale of the software."). Under Kan. Stat. Ann. § 84-2-204, a contract for the sale of goods is formed "in any manner sufficient to show agreement,

including conduct by both parties which recognizes the existence of such a contract." *Wachter*, 144 P.3d at 751.

Here, there are several key events evidencing when plaintiff entered into the contract to purchase software through Redapt (who was defendant's authorized reseller).

- <u>June 25, 2013</u>: Quote from Redapt to Leo Hart (plaintiff's employee) for $101,155.

- <u>June 28, 2013</u>: Mr. Hart told defendant and Redapt that plaintiff needed a 35% discount on the software if they were going to complete the purchase.

- <u>June 28, 2013</u>: Second quote from Redapt to Mr. Hart for $93,325. The quote included an itemized list of software, including the quantity, time period for execution, and cost for incidental maintenance. Although this quote was dated June 28, plaintiff did not receive it that day.

- <u>June 28, 2013</u>: Christopher Austin, an employee of defendant, emailed Mark Herron (Redapt's V.P. for Technology Solutions) and Mr. Hart (with plaintiff) to state that he did get the 35% discount that plaintiff requested on the products, but said that defendant would not discount maintenance beyond 25%. Mr. Austin encouraged Mr. Hart to "work out the numbers with Mark [Herron (Redapt)] and get the [purchase order] over to Redapt as soon as possible."

- <u>June 28 or 29, 2013</u>: Mr. Herron received notification by e-mail and a phone call that plaintiff had agreed to purchase the software.

- <u>June 29, 2013</u>: Defendant claims that Ingram (the distributor) registered plaintiff for the purchase of the software in defendant's system under the Enterprise License Program. Defendant claims that this would have automatically generated a Registration Notice to Mr. Hart, which notified him that placing a purchase order with Redapt constituted an acceptance of the EULAs, with a direct hyperlink to the EULAs.

- <u>June 29, 2013</u>: Defendant sent Mr. Hart the Citrix License Access Code Delivery email, which contained the License Access Code that allowed plaintiff to download the software. The email says, "Dear Citrix Customer, Thank you for your recent purchase." Testifying in a deposition about this email, Steward Byrne (defendant's corporate counsel for all commercial transactions in the Americas) stated that "the purchase had already occurred." Although there is no evidence showing the date that plaintiff downloaded the software, upon installation, a license embedded in the software required the user to "accept" defendant's EULAs.

- <u>June 29, 2013</u>: Defendant issued an invoice to Ingram for the sale of the software. Ingram had already placed the software order with defendant on this date.

- <u>June 29, 2013</u>: Redapt dated an invoice for the sale of the software to plaintiff in the amount of $93,925. It is unclear when plaintiff received this invoice, but it was mailed to plaintiff on June 29 at the earliest. Assuming a three-day delivery period, the earliest that plaintiff would have received this invoice was July 2, 2013. Mr. Herron (with Redapt) testified that Redapt never sends invoices to its customers before Redapt has a signed purchase order. The second page of the Redapt invoice states that the software is subject to a "user license," but does not list the terms, and the EULAs are not attached as part of the invoice.

- <u>July 1, 2013</u>: Mr. Hart informed Mr. Herron that he "had received an e-mail from [defendant] which appear[ed] to be a license access code," but he had not yet received a "revised software quote" from Redapt showing the reduced purchase price. Mr. Hart said, "I want to get those items back to you soon if possible."

- <u>July 1, 2013</u>: Mr. Herron replied by e-mail to Mr. Hart with a revised software quote reflecting the purchase price of $93,925.

- July 1, 2013: Mr. Herron asked Mr. Hart to sign the revised software quote and return it. Mr. Hart had Todd Taylor, plaintiff's Vice President of Technical Services, initial the revised software quote, and Mr. Hart then emailed it to Mr. Herron.

Based on the above timeline and facts, the court concludes that the contract was formed on July 1, 2013. This is when the parties engaged in conduct evidencing the existence of a contract. Although Mr. Byrne thought the purchase had already occurred on June 29 and the License Access Code Delivery email acknowledged that plaintiff had purchased the software, it appears that this was a one-way understanding. Plaintiff did not yet believe that the parties had a contract—as evidenced by Mr. Hart's e-mails of July 1, 2013. As noted above, Kan. Stat. Ann. § 84-2-204 permits a contract for the sale of goods to be "made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Here, there was not conduct by both parties evidencing the existence of a contract until July 1. Based on all of these actions, the court determines that the contract was formed on July 1, 2013.

### Were the EULAs part of the original contract?

The next question is whether the EULAs were part of the contract formed on July 1, 2013. The quotes did not reference or include the EULAs. Neither did the Citrix License Access Code Delivery email. And while the Redapt invoice did mention an end-user license agreement, it was mailed on June 29, 2013 or later—and was not received until after the contract was already formed. The EULAs were, however, electronically attached to the software. They were what are considered "click-thru" agreements, which means that in order to accept the agreements, the party to be bound must click on the agreements to accept them. Defendant claims that for plaintiff to install the software, plaintiff would have had to accept the agreements.

Defendant has not presented any evidence that plaintiff did, in fact, click on the EULAs and accept them. But regardless of whether plaintiff did, "continuing with the contract after receiving a writing with additional or different terms is not sufficient to establish express consent to the additional or different terms." *Wachter*, 144 P.3d at 752–53 (citing *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 98 (3d Cir. 1991); *Arizona Retail Sys. v. Software Link*, 831 F. Supp. 759, 764 (D. Ariz. 1993); *Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332, 1341 (D. Kan. 2000); *U.S. Surgical Corp. v. Orris, Inc.*, 5 F. Supp. 2d 1201, 1206 (D. Kan. 1998)).

Defendant also claims that plaintiff is bound by the EULAs because when plaintiff registered for the Enterprise License Program (the program under which plaintiff bought the software), plaintiff had to agree to the terms and conditions of the Enterprise License Program, which included the EULAs. But plaintiff has shown that it did not actually register for the program. If anyone did, it was Ingram, who was not acting as an agent for plaintiff. As defendant's software distributor, Ingram performed administrative responsibilities relating to order aggregation and processing. Plaintiff, however, was unaware of Ingram's involvement in the transaction until defendant filed its motion to transfer venue. Defendant does not have any documentation authorizing Ingram to register plaintiff for the Enterprise License Program. Ingram also did not produce any documents showing that it registered plaintiff for the Enterprise License Program or that plaintiff authorized it to register plaintiff. Ingram did, on the other hand, produce an affidavit stating that it does not officially register end-users for defendant's Enterprise License Program and that it did not register plaintiff for the Enterprise License Program.[1]

---

[1] Attached to defendant's reply memorandum is a "supplemental declaration" of Gregory Eyrick, Ingram's sales manager for the Partners Licensing Group. This document directly contradicts an earlier declaration of Mr. Eyrick. In the supplemental declaration, Mr. Eyrick states that Ingram does, in fact, register end-users and others for defendant's Enterprise License Program. Plaintiff asks the court to disregard Mr. Eyrick's supplemental declaration as a sham affidavit. The court finds it

Defendant also claims that after registering for the software, plaintiff (through Mr. Hart) received a Registration Notice that included a hyperlink to defendant's EULAs. But the evidence that defendant submitted to show this notice is not actually a Registration Notice sent to plaintiff; it is a template that defendant represents goes out to all who register for its software. Defendant asks the court to presume that plaintiff received the notice, *see Howard v. Ferrellgas Partners, LP*, 92 F. Supp. 3d 1115, 1135 (D. Kan. 2015), but plaintiff has presented an affidavit signed by its president, Walt Lane, that states that plaintiff never received the Registration Notice from defendant. This affidavit is the subject of defendant's motion to strike.

Defendant asks the court to strike Mr. Lane's affidavit because it provides no foundation to support Mr. Lane's statement and Mr. Lane has no personal knowledge as to whether Mr. Hart received the e-mail. Fed. R. Evid. 602 requires that a witness have "personal knowledge of the matter" testified to.

Plaintiff maintains that the court may consider the affidavit because Mr. Lane is president of the company and has the required personal knowledge. Alternatively, plaintiff asks the court to allow plaintiff to supplement Mr. Lane's original affidavit to cure any defect. In his supplemental affidavit, Mr. Lane clarifies that he was employed by plaintiff during the relevant time; that he has access to all e-mails of employees; and that he has searched Mr. Hart's e-mails and was unable to find a Registration Notice e-mail. The court concludes that Mr. Lane's supplement cures any defect that may have existed in his original affidavit, and therefore denies defendant's motion to strike.

There is little doubt that defendant intended for the EULAs to be part of the contract. The Citrix Solutions Membership Agreement ("CSA") between Redapt and defendant states in paragraph

---

unnecessary to resolve this dispute because whether Ingram registered plaintiff for the Enterprise License Program or not, there is no evidence suggesting that Ingram was acting as plaintiff's agent in doing so. And whether Ingram does register end-users or does not, there is no evidence here that Ingram registered plaintiff.

11.1 that a "Citrix Solutions Advisor shall inform its customers [plaintiff in this case] in its marketing materials and through its sales process that use of Citrix products and services is subject to the terms of the customers' license and/or service agreements with Citrix."  But there were no discussions between plaintiff and Redapt regarding the EULAs applying.  Mr. Herron did not send the EULAs to plaintiff.  Defendant does not have records showing that plaintiff received the EULAs, viewed them, or clicked on them.  The Citrix License Access Code Delivery email does not have a link to the EULAs, and Mr. Hart does not recall seeing a copy of them.  And plaintiff never signed a copy of the EULAs or was asked to sign them.  Despite defendant's intention, it appears that incorporation of the EULAs into the contract did not happen in this instance.

Based on these facts, the court determines that the EULAs were not part of the original contract between the parties.

**Were the EULAs material alterations, so that they did not act to modify the contract?**

Because the contract was formed on July 1, 2013, the court must decide whether the EULAs were proposed amendments to the contract that should be incorporated.  "Proposed amendments that materially alter the original agreement are not considered part of the contract unless both parties agree to the amendments."  *Wachter*, 144 P.3d at 752.  "[A]n addition to a contract is a material alteration when it 'results in surprise or hardship if incorporated without the express awareness of the other party.'"  *Am. Ins. Co. v. El Paso Pipe & Supply Co.*, 978 F.2d 1185, 1189 (10th Cir. 1992) (quoting Kan. Stat. Ann. § 83-2-207(2) cmt. 4).

The EULAs contain at least three limitations that are relevant in this case: (1) a consent to exclusive personal jurisdiction and venue in Broward County, Florida; (2) a limitation of damages clause that limits damages to the cost of the software; and (3) various limitations on the warranties for the software.

Materiality is determined by the specific factual circumstances of each case. *Id.* at 1190. To determine whether the element of surprise is present, "[c]ourts should first make factual findings as to whether a non-assenting party knew of an added term. It must then make findings of fact concerning whether that party should have known that such a term would be included." *Id.* at 1191. The court considers several factors in making these determinations, including (1) the parties' prior course of dealing; (2) the number of written documents containing the additional terms; (3) industry custom; (4) whether the additional terms were clearly marked; and (5) whether the additional terms are in the standard contract used by the non-assenting party. *Id.* (citations omitted); *see also Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 766 (10th Cir. 1983).

The evidence before the court indicates that plaintiff did not actually know that the EULAs were intended to be part of the agreement. There is no evidence that anyone discussed the provisions with plaintiff or that plaintiff saw them before receiving the invoice in the mail after the contract was formed. It appears that the terms were only included or referenced on a registration page that plaintiff did not see and on an invoice that plaintiff received after the contract was formed. Under these facts, the court cannot find that plaintiff had actual knowledge of the additional terms.

The court next turns to whether plaintiff should have known about the EULAs. Defendant claims that plaintiff should have known that the EULAs would apply because over twelve years, plaintiff acted as a reseller for defendant eighty-five times, selling software to end-users under defendant's Easy Licensing Program. Each time, the software was sold subject to defendant's EULAs. Plaintiff's right to sell defendant's software to end users was specifically subject to defendant's license, per the CSA. Additionally, in 2009, plaintiff purchased software under the Easy Licensing Program from defendant, subject to the EULAs. Defendant's EULAs applicable to its software are the same for purchase under the Easy Licensing Program and the Enterprise License Program.

Despite the parties' long-standing relationship and history, the court determines that plaintiff did not have reason to know that this purchase of software—as an end-user and through a different program than plaintiff itself sold software under—would include the EULAs. Plaintiff was not purchasing software from defendant in its ordinary capacity; in fact, it was not allowed to do so. It had only purchased as an end-user once before, and that was four years prior to this purchase. Under these circumstances, the element of surprise is met.

Although the court finds that the alteration constitutes a surprise to plaintiff, the court also considers whether it constitutes a hardship. Courts have been critical of whether hardship constitutes an independent ground for finding an alteration material. *See*, *e.g., Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1336 (7th Cir. 1991) ("Hardship is a consequence [of material alteration], not a criterion. (Surprise can be either.)"); *see also*, *e.g., Suzy Phillips Originals, Inc. v. Coville, Inc.*, 939 F. Supp. 1012, 1017–18 (E.D.N.Y. 1996). Therefore, the court does not rely on hardship alone. The hardship imposed on plaintiff, however, does weigh in favor of finding the alterations material.

Plaintiff is a local company, and its only two locations are in Kansas. Plaintiff's primary witness (Mr. Hart) no longer works for plaintiff, and lives in Kansas. Plaintiff pleads damages exceeding $4 million, based on the software price, the purchase of additional hardware to make the software work, the cost of an implementation project, the cost of IT support services, lost labor hours, and lost profits. If the EULAs apply, plaintiff's damages will be limited to the price it paid for the software. In addition, the EULAs limit the warranties on the software. These present material alterations to the contract, and the court therefore concludes that they did not serve to modify the contract unless plaintiff accepted them.

The court further concludes that plaintiff did not accept the additional material terms by installing the software. Even if plaintiff actually clicked on the EULAs and accepted them during installation, "continuing with the contract after receiving a writing with additional or different terms is not sufficient to establish express consent to the additional or different terms." *Wachter*, 144 P.3d at 752–53 (citations omitted). Moreover, if the contract had been modified, Kan. Stat. Ann. § 84-2-209 requires a signature for modification. There is no evidence of plaintiff's signature on the EULAs. The court concludes that the EULAs were an attempt to modify the contract that was not accepted by plaintiff. The EULAs therefore do not apply.

## **Should the EULAs be enforced because plaintiff had notice of them?**

Defendant alternatively argues that plaintiff should be bound by the EULAs because plaintiff had notice that the software sale would be subject to the EULAs. Defendant bases its argument on the long-standing relationship between the parties and the fact that for other transactions, plaintiff has acted as a reseller. As a reseller, plaintiff was subject to the CSA. The CSA included EULAs, and defendant told its resellers that they were responsible for making sure that buyers understood that their purchases were made subject to defendant's licensing agreement.

Plaintiff purchased and sold products as a CSA through defendant's <u>Easy</u> Licensing Program. Here, plaintiff purchased the software through defendant's <u>Enterprise</u> License Program. Because of this difference, plaintiff was not independently familiar with the terms of the <u>Enterprise</u> License Program—including whether the purchaser was bound by an end-user license agreement. And, significantly, plaintiff purchased the software here as an end-user, not as a reseller.

This case is distinguishable from *Meridian Project Systems, Inc. v. Hardin Construction Co.*, 426 F. Supp. 2d 1101 (E.D. Ca. 2006), a case cited by defendant. In *Meridian*, the court found a license agreement binding because the defendant had notice of the agreement. But in *Meridian*, the

court followed Seventh Circuit law that held that a license agreement is not invalid when it is received after the purchase. In addition, the purchaser in *Meridian* had previously purchased licenses to use other versions of the same software. This is different than the situation presented to the court now. Kansas law dictates that a later-received license agreement be treated as a request to modify, and this software was different than plaintiff's prior purchases from defendant.

Defendant also claims that the EULAs were on its website. But the evidence that defendant produced in response to plaintiff's request for production of documents shows that the relevant documents were on its website in May 2013, not on the date of the sale of the software. And to the extent that the EULAs were actually on defendant's website, they were product-specific, and plaintiff never viewed them. The court concludes that plaintiff did not have notice of the EULAs by virtue of defendant's website or prior relationship with defendant.

### Should this case be transferred to Florida?

Because the court determines that the parties' agreement does not include the forum selection clause, there is no valid basis to transfer this case to the Southern District of Florida. Defendants have made no other arguments for transfer, and the court determines that one is not appropriate under § 1404. Defendant's motion is denied.

**IT IS THEREFORE ORDERED** that Defendant Citrix Systems, Inc.'s Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (Doc. 30) is denied.

**IT IS FURTHER ORDERED** that Citrix Systems, Inc.'s Motion to Strike Declaration of Walt Lane (Doc. 76) is denied.

Dated this 21st day of June, 2017, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**